**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LEVAR T. HENRY,<br>*Plaintiff*,<br><br>v.<br><br>JODI HILL-LILLY and ALYSSA BURROUGHS,<br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:25-CV-00380 (KAD)<br><br><br><br><br>August 14, 2026 |

**MEMORANDUM OF DECISION**
**RE: Motions to Dismiss (ECF No. 23, 32)**

Kari A. Dooley, United States District Judge:

The self-represented plaintiff, Levar T. Henry, filed this civil rights action for damages while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") against two employees of the Connecticut Department of Children and Families ("DCF"): DCF Commissioner Jodi Hill-Lilly and DCF Social Worker Alyssa Burroughs. Compl., ECF No. 1.

After an initial review under 28 U.S.C. § 1915A(a)(1), the Court permitted Plaintiff to proceed on his claims of (1) Fourteenth Amendment procedural due process and substantive due process violations against Commissioner Hill-Lilly and Social Worker Burroughs; (2) a violation of his First and Fourteenth Amendment right to intimate association against Social Worker Burroughs; (3) Fourteenth Amendment stigma plus violation against Commissioner Hill-Lilly and Social Worker Burroughs; and (4) state common-law torts of defamation and intentional infliction of emotional distress against Commissioner Hill-Lilly and Social Worker Burroughs. ECF No. 17. The Court dismissed all other claims and clarified that the Initial Review Order permitted

these claims to proceed without prejudice to Defendants seeking dismissal.[1] *Id.* at 30.

Defendants have filed separate motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 23; ECF No. 32.[2] Plaintiff has filed a response to each motion to dismiss. ECF No. 25; ECF No. 34.

The Court has great sympathy for the Plaintiff, who, with the assistance and support of his family, has tried his best to be a present father in the life of his daughter, despite navigating Connecticut's child protection courts from prison. Plaintiff alleges many errors and otherwise inappropriate conduct by Defendant Burroughs, and if the allegations are proven, it appears that the situation involving his daughter could have been handled differently (and better). But, despite Plaintiff's many grievances as to how his case was addressed, Plaintiff simply does not adequately allege the constitutional violations he pursues.

For the following reasons, the motions to dismiss are GRANTED.

**ALLEGATIONS**

The Court summarizes the factual allegations from the Complaint which are accepted as true for purposes of the motions to dismiss.

Since October 2015, Evelyn Verner, the birth mother of Plaintiff's biological child Jada (who was born in Bridgeport, Connecticut, in 2015), has been subject to the supervision of DCF Commissioner Hill-Lilly. Compl. ¶ 11. Plaintiff was determined to be Jada's biological father in 2018 after a paternity test. *Id.* ¶¶ 14–16.

---

[1] Plaintiff's request for relief sought compensatory and punitive damages against Defendants. IRO at 31. Any claims for damages against Defendants (both state employees) in their official capacities are barred by the Eleventh Amendment. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

[2] Both Defendants have provided Plaintiff with the Notice to Self-Represented Litigant as required under this District's Local Rule 12(a). *See* ECF No. 23-1, at 22–26; ECF No. 32-1, at 20–24.

In January 2019, while in DOCCS custody, Plaintiff petitioned the Connecticut Superior Court for visitation rights with Jada, and he petitioned the Connecticut Probate Court to have Jada's last name changed to Henry. *Id.* ¶ 17. The Superior Court denied his petition for visitation on the grounds that it was inappropriate for a child to visit him at the DOCCS prison. *Id.* ¶ 18.

Plaintiff wrote to the court to request a notice of appeal, but the court clerk allegedly insisted he submit a request to reargue his case. *Id.* ¶ 19. Plaintiff later explained that he would be on post-release supervision and needed an order for visitation to leave the State of New York or he would risk violation of his parole. *Id.* ¶ 20. The Superior Court left the case open so that Plaintiff could report to the court on a designated date after his release. *Id.* Plaintiff was released from prison in late 2019. *See id.* ¶ 22.

In February or March 2020, after several court continuances due to Verner's failure to appear, the Connecticut Superior Court granted Plaintiff's petition for visitation. *Id.* ¶¶ 22–24. In March 2020, the Connecticut Probate Court granted Plaintiff's petition to change Jada's last name on her birth certificate to Henry, and Plaintiff received a copy of the corrected birth certificate. *Id.* ¶¶ 25–26. In May 2020, the Connecticut Superior Court found Verner in contempt for failing to follow the visitation order. *Id.* ¶ 27.

In March 2021, Jada informed Plaintiff that she was afraid of a man associated with Verner known as "Popi." *Id.* ¶ 30. An order of protection was pending against Popi and another male associate of Verner known as "Jefferys." *Id.* In March 2021, Plaintiff and his son filed a petition for custody of Jada that included allegations about Jada's fear of Popi. *Id.* ¶ 32. Plaintiff heard from his son that Jada's living conditions were unacceptable. *Id.* ¶ 33. In June 2021, Verner still

refused to comply with the Connecticut Superior Court orders. *Id.* ¶ 40. Nonetheless, DCF and probation ignored all of the alerts from the court. *Id.*

On June 19, 2021, Plaintiff was arrested in New York. *Id.* ¶ 41. In July 2023, Plaintiff reentered DOCCS custody. *Id.* ¶ 44. Plaintiff maintained contact with Jada, speaking to her twice a week while in DOCCS custody in 2023. *Id.* ¶¶ 43–44. During his incarceration, Verner told Plaintiff that DCF Commissioner Hill-Lilly "insist[ed]" that there was no person named Levar Henry in existence. *Id.* ¶ 44.

In August 2023, Plaintiff filed a DOCCS Proximity to Minor Child Transfer Request through his Offender Rehabilitation Coordinator. *Id.* ¶ 45. He listed all of his minor children, including Jada, on his application. *Id.* Verner, who was under DCF supervision, approved of the application. *Id.* In January 2024, Plaintiff was moved to Sing Sing Correctional Facility in Westchester County to participate in the program to enhance families. *Id.*

On July 8, 2024, Plaintiff had a scheduled call with DCF Social Worker Burroughs, who advised him that Verner was being charged with neglect. *Id.* ¶ 52. She noted that Verner would not answer telephone calls from DCF. *Id.* Plaintiff responded that he had spoken to Verner recently and that her daughters, Jada and Khloe, were at summer camp. *Id.* Burroughs was upset that Plaintiff had this information but she did not. *Id.*

Later that day, Plaintiff was served with a petition filed by DCF Commissioner Hill-Lilly and Social Worker Burroughs in Connecticut Superior Court. *Id.* ¶ 54. It charged him with neglect for permitting a child to live under injurious conditions. *Id.* DCF Social Worker Burroughs had not advised Plaintiff during the telephone call that he would be a respondent in the Neglect Petition. *Id.*

Plaintiff alleges that the Petition was authored by Hill-Lilly and Burroughs. *Id.* ¶ 56. He claims the Petition damages his reputation because it refers to him as an "alleged father" and states:

> The Family has a history with DCF dating back to 2015. There has been a total of 9 reports of which 2 were substantiated due to physical neglect and emotional neglect.

*Id.* ¶¶ 55, 57. He complains that DCF Commissioner and Social Worker Burroughs misspelled his name as "Lever Henry" instead of "Levar Henry" in their sworn statements; referred to his daughter as "Jada Verner" rather than her legal name "Jada Henry"; and misrepresented that DCF made "multiple attempts" to contact him at Sing Sing Correctional facility. *Id.* ¶¶ 56, 58, 59. Plaintiff's Freedom of Information requests revealed that Social Worker Burroughs made only one telephone call to Plaintiff's facility to schedule the telephone call with Plaintiff on July 8, 2024. *Id.* ¶ 61.

In a second call in late July 2024, Burroughs advised Plaintiff that she had tried to call him at Sing Sing for a year, and Plaintiff informed her that he had not been housed at Sing Sing for a year. *Id.* ¶¶ 58, 63. She informed him that Verner had been incarcerated and that there was nothing he could do about Jada's custody because he too was incarcerated. *Id.* ¶ 63. Plaintiff asked her to contact his ex-wife to pick up Jada, but Burroughs replied that DCF would not likely honor his request due to the pending neglect charges. *Id.* ¶ 69.

On July 30, 2024, Plaintiff was served with an Order of Temporary Custody. *Id.* ¶ 64. Plaintiff complains that that Commissioner Hill-Lilly's motion continued to refer to "Jada Verner" rather than "Jada Henry"; stated that Plaintiff had placed his child in immediate physical danger due to his DOCCS incarceration since 2021; falsely represented that there were "no court orders in effect concerning custody or visitation concerning said child[;]" and erroneously indicated that

Jada was the younger child rather than Khloe (Verner's other daughter). *Id.* ¶¶ 64–65. Plaintiff complains that he is being wrongly named for assaults by the "father of [Verner's] younger child" because he is incarcerated in New York and is not a resident of Connecticut. *Id.* ¶¶ 65, 68.

Plaintiff claims that the falsehoods issued by DCF, including the misstatements about an inability to contact him, have negatively affected his parental rights concerning Jada and his relationships with his other minor children. *Id.* ¶ 67. He was allegedly issued a misbehavior report by DOCCS due to the false and defamatory statement by DCF Commissioner Hill-Lilly and Social Worker Burroughs. *Id.* ¶ 71.

DCF placed Jada with people not associated with her family because family did not reside in Connecticut. *Id.* ¶ 70. After July 9, 2024, Plaintiff was able to make only two successful telephone calls to Jada on October 6, 2024, and October 13, 2024. *Id.* ¶ 72. After Jada was later moved to another home, Social Worker Burroughs informed Plaintiff he was not allowed to call or write to his child at her new location because of the pending neglect charges. *Id.*

On November 4, 2024, Burroughs contacted Plaintiff's Offender Rehabilitation Coordinator to advise that Plaintiff could speak with Jada at 4:30 PM on Fridays by making a third-party telephone call through Burroughs's telephone number. *Id.* ¶ 73. Plaintiff informed his Offender Rehabilitation Coordinator that third-party telephone calls may be prohibited in the prison. *Id.* On November 8, 2024, Plaintiff called Burroughs, who advised she and Jada were stuck in traffic but would see if they could talk; she then never "switched back" to Plaintiff. *Id.* ¶ 74. On November 15, 2024, Plaintiff again attempted to make contact with Jada, but Burroughs did not answer the telephone call. *Id.* Plaintiff claims that DCF has blocked Plaintiff and his

children from contact with Jada, *id.* ¶ 75, and DCF is not facilitating his reunification with Jada. *Id.* ¶¶ 77, 81–82.

DCF has not responded to his grievances and information requests. *Id.* ¶ 84. Plaintiff has not spoken to Jada for several months while she is in DCF care. *Id.* ¶ 85. Plaintiff claims DCF is illegally blocking Jada from contact with her father and siblings without cause. *Id.* ¶¶ 86–87.

Judicial Notice of Court Decisions[3]

The Connecticut Superior Court child protection proceedings as to Jada are integral to Plaintiff's claims of Fourteenth Amendment due process violations. Thus, the Court may take judicial notice of the Superior Court decisions from the matter of *In re Jada V.*, No. F04 CP22-013852-A (available on Westlaw), and unpublished Superior Court orders for *In re Jada V.*, No. F04 CP24-14560-A. *See* Fed. R. Evid. 201. Judicial notice is taken "not to prove the truth of their contents but only to determine what the documents stated." *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

In a decision issued on August 25, 2023, the Connecticut Superior Court explained:

> On November 29, 2022, the petitioner, the Department of Children and Families (DCF) filed an Order for Temporary Custody (OTC) and a petition alleging Neglect on behalf of the minor child Jada V. Jada V. was born . . . [in] 2015 to mother Evelyn V. and putative father Henry L. Evelyn V. has another younger child Khloe J. . . . who is not a subject of this petition. Khloe lives with her father.
>
> After a contested hearing on December 15, 2022, the court (Burgdorff, J.) sustained the Order for Temporary Custody. The neglect petition alleged the statutory grounds of 1) abandonment by respondent parent; and 2) that the child was

[3] A court's consideration of motion under Federal Rule of Civil Procedure 12(b)(6) may include material extrinsic to the complaint if the materials are (1) integral to the complaint, or (2) facts appropriate for judicial notice. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

> permitted to live under conditions, circumstances or associations injurious to her wellbeing. DCF is seeking an adjudication of neglect and commitment to the Department. A psychological evaluation was ordered by the court (McLaughlin, J.) on April 25, 2023.

*In re Jada V.*, No. F04 CP22-013852-A, 2023 WL 5926738, at *1 (Conn. Super. Ct. Aug. 25, 2023).[4] At a trial on July 18, 2023, the court determined "[s]ervice was confirmed for [Plaintiff] by notice of publication" but he was defaulted for failure to appear. *Id.* The court noted the mother, Evelyn V., was present and represented by counsel. *Id.*

The Superior Court found the following facts were supported by the preponderance of the evidence:

> Jada V. was born . . . [in] 2015 to mother Evelyn V. and father Henry L. The father's whereabouts are unknown at this time.[5]
>
> This matter came to the attention of DCF on November 18, 2022 after DCF received a report from the Waterbury police department that Jada's uncle was requesting police assistance because Jada had been dropped off to his home on November 11, 2022 and Jada's mother Evelyn was not responding to his calls to come and pick her up.
>
> In July 2022, Jada's mother, Evelyn made a family arrangement with her great-aunt in New Jersey to take care of Jada during the time that she would be incarcerated at York Correctional. Evelyn was incarcerated from July 2022 until October 24, 2022. Three weeks after Evelyn was released, on November 11, 2022, Evelyn's aunt dropped Jada off at her uncle's house. Evelyn did not initially know that her great-aunt was taking Jada back to Connecticut. Evelyn was made aware once Jada was back in Connecticut, but Evelyn had not yet properly secured suitable housing. Evelyn informed DCF worker Hernandez that she was living with a boyfriend in a rooming house and was unable to bring Jada with her. Evelyn was attempting to obtain her own housing.

---

[4] Although the decision refers to Jada's mother as Evelyn V. (her first name followed by the initial for her last name), it refers to Plaintiff as Henry L. (his last name followed by the initial of his first name). This is perhaps a perpetuation of the types of errors which are alleged to have plagued Jada's child protection proceedings.

[5] Plaintiff's name is again incorrectly reversed. *See supra* at n.4. And it is difficult to understand how the Juvenile Court concluded that Plaintiff's whereabouts were unknown. Presumably, this was the evidence presented by DCF. However, as Plaintiff was incarcerated in New York, it would have been a simple endeavor to locate him.

> As it relates to placement, several of Evelyn's family members were contacted as possible resources for Jada. However, after DCF completed an assessment of the recommended family members, none of them were able to be used for placement because they were either unwilling or they were ruled out. As a result, Jada could not be placed with any family. Jada is currently placed in a non-relative foster home.

*Id.* at *1–2. The court determined the evidence showed "that on or before . . . November 29, 2022, Jada was neglected in that she was permitted to live under conditions and circumstances injurious to her well-being" but it was "in the child's best interest to return the child to the mother's care and custody under a 6-month period of protective supervision." *Id.* at *3–4.

An unpublished 2025 Connecticut Superior Court decision on a permanency plan for Jada reveals that DCF filed another Neglect Petition on June 27, 2024, and (consistent with Plaintiff's allegations) another Order for Temporary Custody on July 24, 2024; that the Order for Temporary Custody of Jada was sustained on October 21, 2024, after a contested hearing; and that DCF's permanency plan filed in June 2025 called for a transfer of guardianship of Jada. *In re Jada V.*, No. F04 CP24-14560-A (Conn. Super. Ct. Oct. 31, 2025).[6] The trial on the neglect petition and proposed permanency plan for Jada took place over three separate days in September and October 2025, with both parents of Jada present and represented by counsel. *Id.* at 1. The Superior Court found that the preponderance of the evidence showed the Order of Temporary Custody was issued in July 2024 because there was no available caregiver for Jada. Her mother was incarcerated following a fight with her ex-boyfriend; Plaintiff remained incarcerated; and a relative with whom Jada was residing was no longer available as a "placement resource." *Id.* at 3. Jada was first placed in a non-relative foster home and thereafter a relative foster home. *Id.* at 6. The Superior

[6] This decision is attached to Burroughs's motion to dismiss at ECF No. 32-3.

Court ultimately rejected DCF's permanency plan to transfer guardianship and ordered Jada to be placed with her mother under a period of protective supervision. *Id.* at 5.

**STANDARD OF REVIEW**

The standards that govern a motion to dismiss under Rule 12(b)(6) are well established. To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *Charles v. Orange County*, 925 F.3d 73, 81 (2d Cir. 2019) (same). In addition, a court is "not bound to accept as true a legal conclusion couched as a factual allegation" or "to accept as true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014).

**DISCUSSION**

Defendants advance several grounds for dismissal of this action. ECF No. 23-1; ECF No. 32-1. The Court first addresses Plaintiff's claims brought pursuant to 42 U.S.C. § 1983.

Section 1983 of Title 42 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." "The common elements to all § 1983 claims are: '(1) the conduct complained of must have been committed by a

person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Lee v. City of Troy*, 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

**Personal Involvement of Commissioner Hill-Lilly**

As an initial matter, Plaintiff's § 1983 claims against Commissioner Hill-Lilly must be dismissed because the allegations do not plausibly suggest her direct personal involvement in any alleged constitutional violation. The Court takes judicial notice of information on the DCF website showing that Hill-Lilly served as its Commissioner from January through September 1, 2025.[7]

A plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991)). This is true with respect to supervisory officials as well. *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) (a plaintiff must "plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability" in order to

[7] A court may take judicial notice of the dates of appointment or election of a public official. *Watley v. Dep't of Child. & Fams.*, No. 3:13-CV-1858 (RNC), 2019 WL 7067043, at *3 (D. Conn. Dec. 23, 2019) (citing *Gladden v. City of New York*, No. 12-CV-7822 (PKC), 2013 WL 4647193, at *3 (S.D.N.Y. Aug. 29, 2013) (taking judicial notice of biographical information on government website). Thus, the Court takes judicial notice of information on the Connecticut government website about Commissioner Hill-Lilly's appointment. *See Governor Lamont Congratulates DCF Commissioner Hill-Lilly on Accepting Position with National Child Advocacy Organization*, CT.gov (Aug. 13, 2015), https://portal.ct.gov/governor/news/press-releases/2025/08-2025/governor-lamont-congratulates-dcf-commissioner-hill-lilly.

hold a state official liable for damages under § 1983. "[I]t is not enough for [a plaintiff] to show that [a defendant] was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had"). "A supervisor's 'mere knowledge' . . . is not sufficient because that knowledge does not amount[] to the supervisor's violating the Constitution." *Id.* at 616–17 (quoting *Iqbal*, 556 U.S. at 677).

In his Complaint, Plaintiff alleges that Jada's mother, Verner, was under the supervision of DCF Commissioner Hill-Lilly, *see, e.g.*, Compl. ¶¶ 12–13.[8] He also alleges that Verner informed him that Connecticut DCF Commissioner Hill-Lilly "insist[ed]" that there was no person named Levar Henry in existence, *id.* ¶ 44, and in 2024, he was served with a Neglect Petition, in which Commissioner Hill-Lilly (and Burroughs) misspelled his name, identified Jada by the wrong last name, referred to him as an "alleged father," and made misrepresentations about his neglect of Jada. *Id.* ¶ 54–55, 57, 64.

Plaintiff appears to have concluded that Commissioner Hill-Lilly herself filed the Neglect Petition and Order for Temporary Custody. Plaintiff misapprehends the procedural reality of child protection proceedings. All pleadings filed by the State in the Superior Court for Juvenile Matters are filed in the name of the Commissioner at the time of filing. *See, e.g.*, *In re Teagan K.-O.*, 335 Conn. 745 (2020) (noting petition filed by DCF Commissioner); *In re Joseph R.*, No. U06-CP21-012810-A, 2025 WL 2125278, at *1 (Conn. Super. Ct. July 17, 2025) (same). Hill-Lilly's position as the commissioner of DCF, standing alone, "is not sufficient to plausibly show

---

[8] The Connecticut Superior Court decisions—No. F04 CP22-013852-A and No. F04 CP24-14560-A—reflect that Verner was placed under protective supervision, a court disposition providing for continued superior court jurisdiction over the matter with the ability to modify an original disposition. *See Pace v. Montalvo*, 186 F. Supp. 2d 90, 99 (D. Conn. 2001) (under protective supervision the "court retains continuing jurisdiction and involvement in the case"); *In re Stanley D.*, 45 Conn. App. 606, 611 (1997) (noting that the court retains jurisdiction under protective supervision, and if the court finds parental noncompliance with its orders, the court may modify the original disposition), *cert. denied*, 243 Conn. 910 (1997).

[her] personal involvement in the alleged constitutional violations." *McCoy v. Admin. for Child.'s Servs.*, No. 23-CV-3019 (SJB), 2024 WL 4379584, at *10 (E.D.N.Y. Aug. 9, 2024), *report and recommendation adopted in relevant part*, 2024 WL 4344791 (Sept. 30, 2024).

Plaintiff's allegations do not describe Hill-Lilly's direct personal involvement in the child protection proceedings involving Jada and therefore fail to plausibly allege that she is liable for any deprivation of Plaintiff's Fourteenth Amendment due process rights. Thus, the Court dismisses Plaintiff's § 1983 claims for damages against Commissioner Hill-Lilly.

**Fourteenth Amendment Due Process Violations**

With consideration of the judicially noticed Superior Court decisions, the Court reviews whether Plaintiff states plausible claims of Fourteenth Amendment procedural and substantive due process violations against Defendant Burroughs.

<u>Procedural Due Process</u>

The Court permitted Plaintiff to proceed on a Fourteenth Amendment procedural due process violation out of a concern that he may have sustained a deprivation of his constitutionally protected parental rights without a hearing. IRO at 15–16.

A procedural due process claim requires: (1) the existence of a protected property or liberty interest and (2) deprivation of that interest without due process. *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). If there was a deprivation of a protected property or liberty interest by the state, the court must consider the process by which such deprivation occurred and determine whether that process was constitutionally adequate. *See Zinnermon v. Burch*, 494 U.S. 113, 126 (1990). "The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews v.*

*Eldridge*, 424 U.S. 319, 348 (1976). Notice is reasonable if it is "calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (citations omitted).

Parents have a fundamental liberty interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000); *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999). However, the government has a compelling interest in the welfare of children, and the relationship between parent and child may be investigated and terminated by the state provided constitutionally adequate procedures are followed. *Santosky v. Kramer*, 455 U.S. 745, 766 (1982). Thus, "[n]otwithstanding the existence of this constitutional right, the right to family integrity does not include a constitutional right to be free from child abuse investigations." *Roach v. Clark*, No. 5:15-CV-408 (LEK) (ATB), 2015 WL 4067504, at *10 (N.D.N.Y. July 2, 2015) (quotation marks and citation omitted).[9]

Accordingly, "before parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Schweitzer v. Crofton*, 580 F. App'x 6, 10 (2d Cir. 2014) (summary order) (quoting *Southerland v. City of New York*, 680 F.3d 127, 149 (2d Cir. 2012) (internal quotation marks omitted)). Except in emergency circumstances, judicial process must be provided before removal of the child from his or her parent's custody. *Southerland*, 680

---

[9] The due process rights available to plaintiffs in child custody matters have been analyzed under both procedural and substantive provisions. *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 95–96 (N.D.N.Y. 2013). Procedural due process claims challenge the procedure by which a removal is effected, and substantive due process claims challenge the fact of the removal itself. *Id.* (citing *Bruker v. City of New York*, 92 F. Supp. 2d 257, 266–67 (S.D.N.Y. 2000)).

F.3d at 142 (citing *Kia P. v. McIntyre*, 235 F.3d 749, 759–60 (2d Cir. 2000)); *see also K.W. ex rel. K.A. v. City of New York*, No. 24-3042, 2026 WL 1391967, at *13 (2d Cir. May 19, 2026) (summary order) (same).

The Connecticut General Statutes provide procedural safeguards for child welfare removal orders.[10] Relevant to this case, Neglect Petition proceedings are governed by Conn. Gen. Stat. § 46b-129, and "are comprised of two parts, adjudication and disposition." *In re Olivia W.*, 223 Conn. App. 173, 183 (2024). Section 46b-129 sets forth procedures for parental notice and opportunity to be heard prior to entry of an Order of Temporary Custody. *See* Conn. Gen. Stat. § 46b-129(a)–(h).[11] Additionally, an Order of Temporary Custody is subject to an immediate appeal. *In re Shamika F.*, 256 Conn. 383, 402 (2001).

Here, Plaintiff alleges that he was served with the 2024 Neglect Petition and Order of Temporary Custody while he remained incarcerated. Compl. ¶¶ 54, 64. He does not appear to advance any claim that the Order of Temporary Custody, which was subsequently sustained, was obtained or sustained in violation of his procedural due process rights. As an incarcerated parent, he was unavailable to take custody of Jada. Thereafter, however, the court convened a trial on the underlying neglect petition in conjunction with the permanency plan proposed for Jada.[12] As

---

[10] Connecticut General Statutes § 17a-112 sets forth the process and elements DCF must prove for a petition to terminate parental rights.

[11] Section 46b-129(h)provides: "If any parent or guardian fails, after due notice of the hearing scheduled pursuant to subsection (g) of this section and without good cause, to appear at the scheduled date for a contested hearing on the order of temporary custody or order to appear, the court may enter or sustain an order of temporary custody."

[12] When DCF has custody of a child, whether by virtue of an Order of Temporary Custody (as was the case here) or following an adjudication of a Neglect Petition, DCF is required to do permanency planning and to propose to the Superior Court a permanency plan that is in the best interests of the child. The child's parents have a right to be heard as to whether the proposed permanency plan is in the child's best interests or whether an alternative plan should be approved.

reflected in the *In re Jada* decision, Plaintiff was afforded notice and opportunity to participate in the hearing on the neglect petition and permanency plan for Jada prior to any adjudication of either, that he was indeed present, and that he participated in the proceedings and was represented by counsel. *See* ECF No. 32-3, at 1.

Accordingly, the Court dismisses Plaintiff's claim of Fourteenth Amendment procedural due process violation to the extent it derives from the Juvenile Court proceedings in 2024 and 2025.

Stigma Plus Deprivation Without Due Process

On initial review, the Court construed Plaintiff's claim of constitutional defamation to assert a Fourteenth Amendment "stigma plus" claim on the basis of his asserted temporary loss of child custody resulting from defamatory statements in the DCF filings and his inability to challenge the custody proceedings. IRO at 18–19.[13] The Complaint also alleges that Plaintiff was issued a misbehavior report while in DOCCS custody "[a]s a result of the false and defamatory statements by DCF Hill-Lilly and Burroughs." Compl. ¶ 71.

While defamation claims usually sound in state rather than constitutional law, a plaintiff may assert a procedural due process claim on the so-called "stigma plus" theory by alleging "a stigmatizing statement plus a deprivation of a tangible interest." *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005)); *see DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) ("'Stigma plus' refers to a claim brought

[13] The Court noted Plaintiff satisfied the first element of stigma based on the asserted false statements about his being Jada's "alleged father," his involvement with several incidents of child neglect from 2015–2024, and his role in acts of assault and child endangerment. IRO at 19 (citing Compl. ¶¶ 54–58, 64, 65, 68).

for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process.").

"A "stigma-plus" claim is a species of claim for the deprivation of a liberty interest without due process." *Holley v. Cook*, No. 3:20-CV-170 (MPS), 2021 WL 5302107, at *7 (D. Conn. Nov. 15, 2021). "'Stigma plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' . . . (the plus), *without adequate process*." *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (emphasis added)). To establish a stigma-plus liberty interest, a plaintiff must show two elements: "(1) the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Vega*, 596 F.3d at 81 (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)). "Th[e] state-imposed alteration of status or burden must be 'in addition to the stigmatizing statement.'" *Id.*; *see also Morris v. Lindau*, 196 F.3d 102, 114 (2d Cir. 1999) (defining "stigma plus" as the "loss of reputation coupled with some other tangible element" (internal quotation marks omitted)). "However, 'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Sadallah*, 383 F.3d at 38 (citations omitted) (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)).

For the first element, "a plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004). Defendants maintain that the challenged statements are non-actionable in this context because, as statements made in court filings, they are privileged. ECF No. 32-1,

at 9; *see Casey v. Pallito*, No. 5:12-CV-284, 2016 WL 96157, at *9 (D. Vt. Jan. 7, 2016) ("Because Defendants' remaining statements were made in court filings, they are privileged and cannot form the basis of Plaintiff's 'stigma plus' claim."); *Sharpe v. City of New York*, No. 11-CV-5494 (BMC), 2013 WL 2356063, at *7 (E.D.N.Y. May 29, 2013) (holding that "[e]ven if these . . . statements could be considered constitutionally stigmatizing . . . they cannot support a 'stigma-plus' claim because statements made in the course of court proceedings are absolutely privileged under New York common law" (internal quotation marks omitted)). But it is not entirely clear that the state common-law litigation privilege applies to claims brought under a federal statute such as § 1983. *See Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 197 (D. Conn. 2017) (noting "the Supremacy Clause of the United States Constitution likely prevents [defendant] from prevailing on its argument that Connecticut's common law litigation privilege protects it from liability under . . . a federal statute"); *see Martinez v. State of California*, 444 U.S. 277, 284 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.").

The Court need not decide this issue, because even if the litigation privilege does not apply to preclude this claim, and even if Plaintiff has plausibly alleged a viable stigma-plus liberty interest,[14] "the availability of adequate process defeats a stigma-plus claim." *Segal v. City of New*

[14] Plaintiff alleges that he received a misconduct report as a result of the false statements. The allegedly defamatory statements along with this state action could, at least arguably, provide a factual basis for the "stigma plus" due process claim.

*York*, 459 F.3d 207, 213 (2d Cir. 2006); *see also Balentine v. Tremblay*, 554 F. App'x 58, 61 (2d Cir. 2014) (summary order) ("[T]he adequacy of the process by which Balentine was placed on the online registry is an inquiry in the doctrinal analysis distinct from the existence of a 'stigma-plus' liberty or property right."). Because ultimately, a "stigma plus" claim is still, at its core, about the process received. As noted, Plaintiff alleges that he was served with the 2024 Neglect Petition and Order of Temporary Custody. Compl. ¶¶ 54, 64. While he takes issue with the allegations, he does not challenge the determination that he was unable to have custody of Jada, nor does he challenge the Court's sustaining of the Order of Temporary Custody. Thereafter, while not in custody, Plaintiff received both notice and the opportunity to heard as to the Neglect Petition, as well as the then-pending proposed permanency plan. Again, as revealed in the 2025 Superior Court *In re Jada* decision, adequate procedural safeguards of notice and a hearing were available and implemented prior to the Superior Court's determination of neglect and the proposed permanency plan for Jada. *See* ECF No. 32-3, at 1.

The Court concludes Plaintiff has not alleged facts to support an inference that Defendants acted to deprive him of constitutionally adequate procedural safeguards in connection with the 2024 Neglect Petition and Order of Temporary Custody, and therefore, Plaintiff's claim of Fourteenth Amendment "stigma plus" deprivation is dismissed under Fed. R. Civ. P. 12(b)(6).

<u>Substantive Due Process Violation Due to Parental Rights Deprivation</u>

To state a substantive due process claim arising out of the deprivation of a protected liberty or property interest, a plaintiff must allege facts indicating that defendant's "alleged acts . . . were arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." *Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006) (citations and

internal quotation marks omitted). It is not enough that the government act be "incorrect or ill-advised"; it must be "conscience-shocking." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Tenenbaum*, 193 F.3d at 600 (quotation marks omitted).

"Parents have a substantive right under the Due Process Clause to remain together with their children without the coercive interference of the awesome power of the state." *Trombley*, 929 F. Supp. 2d at 95 (quoting *Southerland*, 680 F.3d at 142). But this right must be balanced by the "compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Id.* at 95–96 (quoting *McCaul v. Ardsley Union Free Sch. Dist*., 514 F. App'x 1, 3 (2d Cir. 2013)).

Here, Plaintiff has not alleged egregious interference with his parental rights to support a substantive due process violation. There is no indication that Plaintiff was arbitrarily deprived of his parental rights, even with the alleged inaccuracies in DCF's 2024 Neglect Petition. And while, if proven, Defendant Burroughs's conduct in cutting off phone calls; restricting phone contact; overstating her efforts to engage with Plaintiff while he was incarcerated; and otherwise being inattentive to Plaintiff's requests, do not speak well of her competency or professionalism, nor are they so conscience-shocking as to implicate substantive due process. And as Plaintiff himself acknowledges in the Complaint, he was incarcerated for much of the time at issue and therefore unable to serve as Jada's primary caregiver. *See* ECF No. 32-3, at 3; *see Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 276 (2d Cir. 2011) ("Where there is no actual loss of custody, no substantive due process claim can lie." (citations omitted)). Accordingly, Plaintiff's Complaint

fails to allege he sustained a deprivation of his parental rights sufficient to support a Fourteenth Amendment substantive due process claim.

Intimate Association

The Court permitted Plaintiff to proceed on a claim for violation of his constitutional right to intimate association because his factual allegations suggest that Burroughs prevented him from having contact with Jada. IRO at 18.

"[T]he freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544 (1987). While the right of association derives from both the First and Fourteenth Amendments, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–19 (1984), the Fourteenth Amendment substantive due process clause affords protection for the right to engage in "highly personal relationships" or intimate association, while the First Amendment applies for claims involving protected speech or retaliation. *Patel v. Searles*, 305 F.3d 130, 135–36 (2d Cir. 2002); *see, e.g.*, *Mulqueen v. Herkimer Cnty. Child Prot. Servs.*, No. 6:22-CV-1301 (ATB), 2023 WL 4931679, at *7–8 (N.D.N.Y. Aug. 2, 2023), *report and recommendation adopted*, 2024 WL 756833 (Feb. 23, 2024) (noting First Amendment applies "[w]here a plaintiff is allegedly retaliated against for the First Amendment activities of a family member and asserts a claim based on intimate association," but Fourteenth Amendment substantive due process analysis applies "[w]here the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns"). But the Supreme Court has observed that "freedom of association is among the rights least compatible with incarceration," and "[s]ome curtailment

of that freedom must be expected in the prison context." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).[15]

On review, the Court concludes that Plaintiff has not alleged facts to support a claim that Burroughs violated his right to intimate association under the Fourteenth Amendment. Plaintiff has not alleged that Burroughs retaliated against him for exercising his First Amendment rights, *see, e.g.*, *Garten v. Hochman*, No. 08-CV-9425 (PGG), 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010), and thus, his claim is subject to the analysis under the substantive due process clause. *See Lowery v. Carter*, No. 07-CV-7684 (SCR), 2010 WL 4449370, at *2 (S.D.N.Y. Oct. 21, 2010) ("When the right of intimate association does not implicate any First Amendment speech or retaliation concerns, as is the case here, the court must analyze the case exclusively as a Fourteenth Amendment substantive due process claim."). As explained above, *see supra* at pp. 19–20, "[t]o state a claim for a violation of substantive due process, a plaintiff must demonstrate that the state action was 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Uwadiegwu v. Dep't of Soc. Servs. of the Cnty. of Suffolk*, 91 F. Supp. 3d 391, 398 (E.D.N.Y. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011)), *aff'd*, 639 F. App'x 13 (2d Cir. 2016).

As discussed above, the allegations regarding Defendant Burroughs's conduct do not speak well of Defendant Burroughs, and they are (and were) certainly upsetting for the Plaintiff, but the

[15] Courts in this Circuit have observed that neither the Supreme Court nor the Second Circuit has clarified the exact boundaries of the right to intimate association for incarcerated individuals. *See Alvarez v. Bause*, No. 9:22-CV-186 (LEK), 2023 WL 1765415, at *4–5 (N.D.N.Y. Feb. 3, 2023) (discussing case law). Further, there is little Second Circuit guidance on an inmate's right to intimate association with their minor children. *See id.* at *5 (collecting cases). However, district courts in this Circuit have generally applied the Second Circuit's test for non-inmates, in which the Court must determine whether the claim falls under the First Amendment or Fourteenth Amendment substantive due process.

conduct, even if proven, is not arbitrary, egregious, or conscience-shocking enough to support a claim for a violation of his substantive due process rights. *See Uwadiegwu*, 91 F. Supp. 3d at 393, 399 (finding no violation of right to intimate association where, *inter alia*, family court denied plaintiff of custody and instituted no-contact order). Accordingly, the Court dismisses Plaintiff's claim of constitutional deprivation based on infringement of his right to intimate association with Jada.

**State Law Claims**

Defendants also move to dismiss Plaintiff's state law claims of intentional infliction of emotional distress and defamation. ECF No. 23-1, at 12–13, 19–20; ECF No. 32-1, at 9–10, 16–17.

A federal court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367(a), which provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Under § 1367(c), a district court may decline to exercise supplemental jurisdiction if, as relevant here, "the district court has dismissed all claims over which it has original jurisdiction." "[T]he district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction." *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996). Notwithstanding, courts regularly decline to exercise supplemental jurisdiction where all federal claims are disposed. *See, e.g.*, *Est. of Ferrara v. United Pub. Serv. Emps. Union*, No. 3:18-CV-527 (VAB), 2020 WL 7714542, at *12 (D. Conn. Dec. 29, 2020); *Salatto v. City of Milford*, No. 3:08-CV-1071 (MRK), 2012 WL 774612, at *15

(D. Conn. Mar. 7, 2012); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases). Indeed, "[w]hen all federal claims are dismissed, district courts should generally decline to exercise supplemental jurisdiction over pendent state law claims." *Collins v. Feder*, No. 3:23-CV-71 (KAD), 2024 WL 5058435, at *7 (D. Conn. Dec. 10, 2024).

Accordingly, the Court declines, under 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over Plaintiff's state law claims for intentional infliction of emotional distress and defamation. These claims must be dismissed without prejudice, and Plaintiff is free to pursue these claims in state court.

**CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss (ECF Nos. 23 and 32) are GRANTED. The Court declines to exercise jurisdiction over Plaintiff's state law claims of intentional infliction of emotional distress and defamation, and such claims are dismissed without prejudice. The Clerk of Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 14th day of August, 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE